UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANDREA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| INDIANAPOLIS METROPOLITAN POLICE | ) | |
| CHIEF, PAUL R. CIESIELSKI, | ) | |
| INDIANAPOLIS METROPOLITAN POLICE | ) | |
| OFFICER, BRANDON HAZELTON, | ) | No. 1:11-cv-00234-SEB-MJD |
| INDIANAPOLIS METROPOLITAN POLICE | ) | |
| OFFICER, BRIAN MCCANN, | ) | |
| INDIANAPOLIS METROPOLITAN POLICE | ) | |
| OFFICER, RICK JONES, | ) | |
| THE CITY OF INDIANAPOLIS, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 70], filed on April 13, 2012 pursuant to Federal Rules of Civil Procedure 56. Defendants seek summary judgment on all of Plaintiff's claims under the United States Constitution, the Indiana Constitution, and Indiana tort law. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

**Factual Background**

Plaintiff Andrea Smith is a resident of Indianapolis who has brought this suit seeking damages for injuries arising out of an April 20, 2010 automobile collision with a group of felony suspects attempting to elude police in a high-speed chase. Defendants are the City of Indianapolis, Chief of Indianapolis Metropolitan Police Paul R. Ciesielski, and three individual

1

officers of the Indianapolis Metropolitan Police Department (IMPD). Defendant Brandon Hazelton is a patrol officer who entered the police academy on July 6, 2009, and graduated to enter service in January 2010. Hazelton Dep. 5. Defendant Rick Jones is a field training officer who had served with IMPD for more than eight years at the time of the accident and was responsible for supervising Officer Hazelton, who was in his initial probationary period as a patrol officer. Jones Dep. 4–6. Defendant Brian McCann is a patrol officer; at the time of the accident he had been in the IMPD's northwest district for approximately three years. McCann Dep. 4.

**1. Circumstances of the Accident**

This lawsuit arises out of a series of events that unfolded rapidly on April 20, 2010. On that morning, Indianapolis resident Antoninett Walker placed a 911 call to report a robbery and request assistance from the IMPD. Defs.' Br. at 2; *see* Lemond Aff. ¶¶ 10–11 . Ms. Walker informed the 911 dispatcher that two of the three suspects had attacked and handcuffed her at approximately 8:30 a.m. According to Ms. Walker, all three suspects—Timothy George, James Hoover, and David Taylor—thereafter entered the home she shared with her fiancé, battered and tied up her fiancé, and looted the residence. Lemond Aff. ¶¶ 4, 8; *see* Am. Compl. ¶ 5. She further noted that the suspects, who were carrying a firearm, had left the premises via Guion Road in a silver Ford Windstar minivan. Hazelton Dep. 29. After Ms. Walker relayed her emergency to the 911 operator, news of the alleged armed robbery was dispatched to all IMPD officers in the vicinity. *See id.*

Among the first officers to hear the radio message describing Ms. Walker's emergency were Officers Hazelton and Jones, who were on duty together as part of Officer Hazelton's

IMPD field training.[1]  Defs.' Br. at 3.  Officer Hazelton, although operating Officer Jones's

police vehicle, was working under Officer Jones's supervision.  *Id.*; Pl.'s Resp. at 2.  When these

officers received the 911 dispatch, they were monitoring traffic at the intersection of 56th Street

and Georgetown Road.  Jones Dep. 25.  Officer Jones asserts that, in light of their proximity to

Guion Road, he and Officer Hazelton decided to pursue the suspects.  *Id.* at 26.  Accordingly,

Officer Hazelton began driving south on Guion Road, soon spotting a vehicle matching the 911

operator's description of the suspects' minivan; he and Officer Jones then notified dispatch of the

discovery and continued to follow the vehicle.  Defs.' Br. at 3–4.

Meanwhile, Officer McCann learned from the IMPD dispatch that Officers Hazelton and

Jones were pursuing the suspects' vehicle and that the minivan and police vehicle would soon

pass him at the intersection of 56th Street and Arabian Run.  Officer McCann decided to "back[ ]

onto the run," *i.e.*, he waited for the two vehicles to pass him and pulled in behind Officers

Hazelton and Jones "[a]s soon as there was no traffic."  McCann Dep. 20, 22.  Officer McCann

asserts that although Officer Hazelton's vehicle's emergency lights and sirens were originally

off, they were both activated "as soon as [Officer McCann] got in behind him."[2]  *Id.* at 23.

Officer McCann followed Officers Hazelton and Jones for the remainder of their pursuit, serving

as the secondary officer.  In that capacity, his main responsibilities were to handle radio traffic

---

[1]On the date in question, Officer Hazelton had graduated from the Indiana Law Enforcement
Academy as a patrol officer and was completing the final two weeks of his probationary period.
Pl.'s Resp. at 2.

[2]Officer Hazelton has testified that he turned on the lights of Officer Jones's vehicle.  However,
Officer Jones turned on the siren.  According to Officer Hazelton, "when the pursuit began[,
Officer Jones] said, 'I'll work the sirens, you pay attention to the car.'"  Defs.' Ex. C at 15.
Officer Jones recalls the activation of the lights and siren a bit differently.  When asked, "When
the [suspects'] vehicle accelerated[,] did he turn both the emergency lights and the siren on?" he
answered, "He did."  Defs.' Ex. D at 30 (referring to Officer Hazelton as the person who turned
on the lights and siren).  He further noted that the lights and siren were "on the entire time of the
chase."  *Id.*

and apprise the IMPD communications personnel of the suspects' location. *Id.* at 15.  At all times during his involvement in the pursuit, Officer McCann alleges that his emergency lights and siren were on and that he switched the siren's intensity from "traditional" to "phaser" near the intersection of Kessler Boulevard and Grandview Drive.  McCann Dep. 2; Defs.' Ex. E at 29.

Hoping to evade the officers, the suspects began driving with increased recklessness; they exceeded the posted speed limit,[3] passed vehicles in "no-passing" zones, and drove through a red light at the intersection of Michigan Road and Kessler Boulevard.  Defs.' Br. at 6.  Officer Hazelton then "slowed and cleared the intersection and . . . began to accelerate in an attempt to catch up to the [suspects'] vehicle."  Jones Dep. 34. At one point, Hazelton's vehicle reached speeds of around 80 miles per hour; despite their attempt to catch up, however, the officers remained far enough behind the suspects that they threatened to lose sight of the fleeing van. Jones Dep. 21–22. The suspects passed into the oncoming traffic lane as they entered a narrow, curved stretch of Kessler Boulevard east of Michigan Road—a predominantly residential area. Popovich Dep. 27. Near a large curve at Kessler's intersection with Fox Hill Road, the suspects' van collided head-on with Plaintiff's car, which was in the proper (westbound) lane of traffic. Smith Dep. 23. Upon arriving at the scene of the collision shortly thereafter, Officers Hazelton, Jones, and McCann approached the suspects' van and arrested all three occupants for their alleged burglary of the Walker home. McCann Dep. 52. From its beginning to the suspects' collision with Plaintiff's car, the chase lasted for approximately three minutes in total. McCann Dep. 23. Plaintiff suffered severe injuries to her hip, knee, and hand as a result of the collision; she spent nearly three months in hospital care and undergoing rehabilitation. Smith Dep. 30.

---

[3]Officer Jones estimates that the posted speed limit in the areas through which the pursuit proceeded was 40 miles per hour.  He recalls observing at least once that Officer Hazelton was driving 80 miles per hour in order to keep up with the suspects.  Defs.' Ex. D at 20–21.

**2. Police Policies and Procedures for High-Speed Chases**

    The City of Indianapolis, through the IMPD, has promulgated several executive orders ("General Orders") governing the general conduct of its police officers.  General Order 1.1, "Law Enforcement Role and Responsibility," sets forth the City's philosophy regarding IMPD officers as follows:

> The primary duty of a police officer is to uphold and enforce the law.  Members of the [IMPD] must accept the responsibility of being held to a higher standard[] and must be able to enforce the laws and protect the rights of its citizens.  The application and enforcement of the law must be accomplished in the spirit set forth by the framers of the United States Constitution.

Defs.' Ex. J, at 1.  This order requires all IMPD officers to swear an oath of office in which they promise to support the United States and Indiana Constitutions.  It also authorizes them to "carry and use any weapon authorized and/or issued by the [IMPD] in the performance of their duties," so long as they receive proper training in the use of such weapons.  *Id.*  Additionally, it obligates them to abide by the Law Enforcement Code of Ethics, which categorizes "safeguard[ing] lives and property" as a fundamental duty.  *Id.* at 2.

    General Order 4.16, "Police Vehicle Operations," obligates all IMPD officers to exercise "due regard for the safety of others" when operating department vehicles.  Defs.' Ex. L, at 1.  "[D]ue caution at all times, regardless of the nature of a run, for the protection of life and property of the employee and others," is mandated.  *Id.* at 2.  When driving official vehicles, officers must conform their conduct to the department's overarching policy that "[s]tate and local exemptions will not protect an employee from consequences of any act involving a reckless disregard for the safety of the employee or others."  *Id.* at 1.  Nevertheless, to recognize and accommodate the frequency with which officers face exigent circumstances, General Order 4.16

5

also provides directives for officers who, in their discretion, are operating department vehicles in

emergencies.  Four of these requirements are that:

> (1) [d]epartment vehicles must be operated under emergency conditions only
> when the officer is responding to a reported or confirmed emergency situation, or
> when properly operating under pursuit conditions.  Officers should refer to
> general order regarding [v]ehicle [p]ursuits;
> (2) [w]hen operating a police vehicle under emergency conditions, the emergency
> lights and sirens must be utilized;
> (3) [a]n officer may disregard an automatic traffic control signal or stop sign only
> when responding to an emergency situation or when properly operating a
> department vehicle under pursuit conditions . . . .  In both instances, the officer
> must approach the intersection with caution and be prepared to stop.  The officer
> may proceed only when it is safe by clearing the intersection lane by lane; and
> (4) [p]olice vehicles approaching an . . . [intersection] must be prepared to take
> evasive action and brake . . . [and] must proceed with caution.

*Id.* at 4.

Protocol for vehicle pursuits[4] can be found in General Order 4.12.  This order explicitly

recognizes that although "[h]igh-speed pursuits are among the most hazardous functions

performed by law enforcement," they are also integral functions of IMPD officers.  Defs.' Ex. K,

at 1.  Accordingly, pursuit guidelines are carefully circumscribed.  An IMPD officer may only

engage in "pursuit driving" when he has witnessed the commission of a felony or traffic offense

or when his ranking officer has ordered him to assist another pursuit vehicle.  *Id.* at 2.  Moreover,

before and during any vehicle pursuit, the involved officer and his supervisor(s) "must consider"

each of the following factors:  the gravity of the offense; the identity of the suspect and other

vehicle occupants; weather, lighting, road, and traffic conditions; the locality and nature of the

pursuit; the officer's familiarity with the area; and the speed of the pursued vehicle.  *Id.*  Either

---

[4]A vehicle pursuit is "[a]n attempt by a law enforcement officer in an authorized emergency
vehicle to apprehend the occupant(s) of a moving motor vehicle when the officer reasonably
believes the driver of the fleeing vehicle is aware of the officer's attempt to stop the vehicle and
is resisting apprehension."  Gen. Order 4.16 at 1 (internal citation omitted).

the pursuing officer or his supervisor may opt to terminate a pursuit. "Factors to consider" in

reaching this decision are similar to those considered before and during pursuit. Ultimately,

officers must quickly consider and weigh these guidelines and determine whether it serves the

public interest to continue the pursuit. At all times, a supervising officer is "responsible and

accountable for ordering the termination of a pursuit if, in [his] experience and judgment, the risk

factors are too great to continue." *Id.* at 7.

## Legal Analysis

### Preliminary Evidentiary Issues

In their reply brief, Defendants contend that Plaintiff's Exhibit A ("Affidavit of Expert

Witness William T. Gaut, Ph.D., Docket No. 79-1), filed May 10, 2012, does not comport with

the Federal Rules of Civil Procedure. Defendants have invoked Rule 37(c)(1) as grounds for this

assertion; the Rule provides, in relevant part, that "[i]f a party fails to . . . identify a witness as

required by Rule 26(a) or (e), the party is not allowed to use that information or witness to

supply evidence on a motion . . . unless the failure was substantially justified or is harmless."

Fed. R. Civ. P. 37(c)(1). In the case before us, the applicable provision of Rule 26 is subpart (a),

which states, in relevant part, as follows:

> [A] party must disclose to the other parties the identity of any witness it may use
> at trial to present evidence under Federal Rule of 702, 703, or 705.[5] . . . Unless
> otherwise stipulated or ordered by the court, this disclosure must be accompanied
> by a written report—prepared and signed by the witness—if the witness is one
> retained or specially employed to provide expert testimony . . . . A party must
> make these disclosures at the times and in the sequence that the court orders.

Fed. R. Civ. P. 26(a)(2).

---

[5]These three rules of evidence govern expert witness testimony.

Here, the parties' Amended Case Management Plan [Docket No. 32] sets forth the times and sequence ordered by the Court. The Plan obligated Plaintiff to disclose the names, addresses, curriculum vitae, and expert reports of any expert witnesses on or before May 12, 2012. Docket No. 32 at 4. In the event that Plaintiff used expert witness testimony at the summary judgment stage, expert witness disclosures were due "no later than 60 days prior to the summary judgment deadline," which was originally March 12, 2012. *Id.* at 5–6. The Court granted Defendants' unopposed motion for thirty more days to file a motion for summary judgment, which extended the deadline to April 12, 2012. *See* Docket No. 68. Accordingly, Defendants argue that all of Plaintiff's expert witness disclosures were to be made on or before April 12, 2012, and that Plaintiff's first disclosure of her intent to rely upon expert testimony of Dr. Gaut at summary judgment occurred on May 10, 2012, nearly one month after the time ordered by the Court.

We decline to strike Dr. Gaut's affidavit and report, because Plaintiff's delay in disclosure may have been based upon a reasonable reading of the language of the Case Management Plan. Since the purpose of such disclosure deadlines in connection to summary judgment motions is to prevent unfair surprise and to allow non-moving parties sufficient time to respond or solicit their own experts, Plaintiff could be forgiven for assuming that the deadline for "us[ing] expert witness testimony at the summary judgment state" applied only when if Plaintiff was the party moving for summary judgment. In fact, recent amendments to the language of the Southern District's model case management plan—adopted after this litigation began—provide clearer wording that ratifies this reading. Section III(G) of the amended plan imposes a 60-day deadline only "if a party intends to use expert testimony in connection with a motion for

summary judgment *to be filed by that party.*" *See* Instructions for Preparing Case Management Plan (http://www.insd.uscourts.gov/Judges/CMP_info.htm) (emphasis added).

It is thus entirely possible that Plaintiff's disclosure did not violate the Case Management Plan at all—and even if it did, the misreading is "substantial justified" by the ambiguity of the Plan's language. More fundamentally, our refusal to strike Dr. Gaut's affidavit is harmless to Defendants, because in our resolution of the constitutional claims below, we do not reach the issue for which Plaintiff introduces their expert opinion. *See infra,* § I(A).[6]

### Standard of Review

Summary judgment is appropriate on a claim if the moving party can show that there is no genuine dispute as to any material fact, leaving them entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will

---

[6] Defendants also urge that we strike Plaintiff's response brief—or at least the offending portion—because it exceeds the normal allotment of 35 pages in violation of Local Rule 7-1. Defs.' Reply 5. Because Plaintiff's response surpasses the limit by less than two pages, we decline to impose such a sanction. *Cf. Aspera v. Copperweld Corp.*, 2006 WL 488686, at *2 (N.D. Ill. Feb. 24, 2006) (declining to strike or truncate a brief exceeding required length by almost 30 pages).

defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Here, the Defendants as the moving party Αbear the initial responsibility of informing the district court of the basis for [their] motion," and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Because Plaintiff, the non-moving party, will bear the burden of proof at trial, Defendants may discharge their burden at this stage of the proceedings by showing an absence of evidence to support Plaintiff's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element Αnecessarily renders all other facts immaterial.@ *Celotex*, 477 U.S. at 323.

### Discussion

Plaintiff frames all of her claims to be against the City of Indianapolis as well as Police Chief Ciesielski and Officers Jones, McCann, and Hazelton in their official capacities. A suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the municipal entity. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978). Since an official capacity suit

is "simply another way of pleading an action against an entity of which an officer is an agent,"

*Graham*, 473 U.S. at 166, we treat Plaintiff's complaint in all respects as a claim against the City

of Indianapolis.

## I.     Constitutional Claims under 42 U.S.C. § 1983

Plaintiff brings her federal claims under the Civil Rights Act of 1871, which provides a

cause of action against "[e]very person who, under color of any statute, ordinance, regulation,

custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United

States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws." 42 U.S.C. § 1983. Here, she asserts that the City and its agents displayed "deliberate

indifference" to public safety in their officer training and their policies, custom, and conduct with

respect to high-speed police chases, thus violating her substantive due process rights under the

Fourteenth Amendment to the United States Constitution. Am. Compl. ¶¶ 11–14. She raises an

additional claim under the Fourth Amendment's protections against unreasonable searches and

seizures. Pl.'s Resp. 21.

In its landmark decision in *Monell v. Department of Social Services,* 436 U.S. 658

(1978), the United States Supreme Court concluded that municipalities are subject to suit as

"persons" under Section 1983. 436 U.S. at 690. They are not, however, subject to *respondeat*

*superior* liability; a plaintiff must show that the municipality itself was the proximate cause—

the "moving force"—behind the deprivation of rights. *Id*; *Grieveson v. Anderson*, 538 F.3d 763,

771 (7th Cir. 2008).

A plaintiff may establish municipal responsibility for a constitutional violation by

showing: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a

widespread practice that, although not authorized by written law or express municipal policy, is

so permanent and well settled as to constitute a custom or usage with the force of law; or (3) […]

that the constitutional injury was caused by a person with final policymaking authority." *Phelan*

*v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006); *Roach v. City of Evansville*, 111 F.3d 544,

548 (7th Cir. 1997). A single incident of misconduct by a city's agents is insufficient to establish

municipal liability, unless there is proof that the incident "was caused by an existing,

unconstitutional municipal policy which policy can be attributed to a municipal policymaker."

*Roach,* 111 F.3d at 548 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–824, (1985)).

There can be no municipal liability under Section 1983, however, unless there has been a

constitutional violation in the first place. In *Collins v. City of Harker Heights,* 503 U.S. 115, 120

(1992), the Supreme Court made clear that "proper analysis requires us to separate two different

issues when a § 1983 claim is asserted against a municipality." 503 U.S. at 120. The issue of

"whether plaintiff's harm was caused by a constitutional violation" is necessarily a precondition

to the apportionment of responsibility for the violation between the city and its individual

employees. *Id.* It is on this fundamental, antecedent question of constitutional harm that

Plaintiff's claim founders. As we discuss below, Plaintiff has put forth no evidence supporting

her claim that Defendants acted with the high level of culpability necessary to trigger a

substantive due process violation, and her Fourth Amendment claim fails as a matter of law.

## A. The Fourteenth Amendment Claim

Outrageous conduct by state or local officials can violate the Fourteenth Amendment's

due process clause. However, such "substantive due process" claims arise only in the rare

circumstances when it becomes necessary to prevent members of the executive branch "from

abusing [their] power, or employing it as an instrument of oppression." *DeShaney v. Winnebago*

*Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). The standard articulated by the Supreme

Court in *Rochin v. California,* 342 U.S. 165 (1952), still governs as the most basic threshold test: the executive conduct must "shock the conscience." 342 U.S. at 172; *see also United States v. Salerno,* 481 U.S. 739, 746 (1987) ("substantive due process prevents the government from engaging in conduct that shocks the conscience") (internal citations omitted).

The Court has since developed more context-sensitive formulations of this standard. When officials operate under normal circumstances, where it would be reasonable to expect conduct attentive to the rights of citizens, they may cross the threshold to unconstitutionality when they display "deliberate indifference" to those rights. *See County of Sacramento v. Lewis,* 523 U.S. 833, 851 (1998); *Bublitz v. Cottey,* 327 F.3d 485, 490 (7th Cir. 2003). In emergency situations, by contrast, when the need for action is urgent and there may be insufficient time for reasoned deliberation, the bar to culpability is even higher: a plaintiff must show that officials acted with an intent to harm. "[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Lewis*, 523 U.S. at 853 (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)). Regardless of context, mere negligence can never constitute a violation of due process. "The Constitution does not guarantee due care on the part of state officials," *Lewis,* 523 U.S. at 849, and the basic principles of federalism dictate that the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis,* 424 U.S. 693, 701 (1976).

In *County of Sacramento v. Lewis,* the Supreme Court applied these substantive due process principles to determine the standards governing police officers' liability for harms

caused by high-speed automobile pursuits. The Court analogized the urgency faced by police in vehicular chases to the exigent circumstances of a response to a prison riot:

> Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance."

*Lewis*, 523 U.S. at 852 (citing *Whitley v. Albers,* 475 U.S. 312, 320 (1986)). For this reason, the Court rejected a "deliberate indifference" standard for police officers in pursuits, holding that a higher level of culpability applies. "Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case. Accordingly, we hold that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment…." *Lewis,* 523 U.S. at 854. Turning to the facts of the police pursuit at issue before them—where a passenger in a suspect's motorcycle was injured in a collision with the chasing police vehicle—the *Lewis* Court found no police conduct blameworthy enough to clear this high threshold. *Id.* at 836–837. The suspect had brought police attention on himself through an egregious traffic violation and had then fled the police at high speeds, and the police had done "nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed forcing other drivers out of their travel lanes." *Id.* at 854. The officers pursued the suspect and his passenger through a residential area at speeds approaching or exceeding 100 miles per hour, and the Court did not rule out the possibility of police negligence. It nonetheless concluded that, "[r]egardless [of] whether [the officer's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience." *Id.*

The strong similarity of the facts before us to those of *Lewis* and other police pursuit cases compels us to reach the same conclusion. Here, Plaintiff was neither the suspect nor the suspect's passenger, but an uninvolved motorist whose vehicle was struck by a fleeing suspect. The Seventh Circuit has not explicitly decided the applicability of the *Lewis* standard where the plaintiff is a bystander to a police chase. *See Bublitz*, 327 F.3d at 490–491 (declining to decide whether *Lewis* or "deliberate indifference" standard applied when bystander was injured by a police roadblock intended to halt a fleeing suspect). But, as the Eighth Circuit has noted, there is no reason that the identity of the aggrieved party should vary the standard to which police officers are held. *Helseth v. Burch,* 258 F.3d 867, 871 (8th Cir. 2001) (holding that "the *Lewis* standard applies regardless of whether a suspect or bystander is hurt"); *see also Bingue v. Prunchak,* 512 F.3d 1169, 1174–1175 (9th Cir. 2008); *Davis v. Twp. of Hillside*, 190 F.3d 167, 169 (3d Cir. 1999) (holding that *Lewis* is "dispositive" even where plaintiff is a bystander).

Plaintiff is unable to point to any facts that could give rise to an inference that her injury resulted from the officers' "conscience-shocking" or otherwise intentional wrongdoing. Plaintiff's designated evidence indicates that the three robbery/burglary suspects, whom the officers had reason to think were armed and had just committed a felony, fled "like a rocket" when the police signaled their presence. Hazelton Dep. 35. Officer Hazelton, who was inexperienced in high-speed pursuits, admitted that the stress of the experience may have influenced his perception: "you have to use your brain in a state of a sense where your body is high on adrenalin, your vision becomes constricted… your fine motor skills go out the window." Hazelton Dep. 7. Nonetheless, nothing in his testimony could reasonably support a claim that he intended to harm either the suspects or bystanders; indeed, he remembered being focused single-mindedly on staying within range of the suspect vehicle. Hazelton Dep. 11–12. Officer Jones,

who was riding with Hazelton, had more experience with high-speed pursuits, but nothing in Plaintiff's designated evidence indicates he took any action in conscious disregard of public safety or pursuit protocols. *See* Jones Dep. 28–32.  Officer McCann testified that he fully understood police officers' responsibility to ensure public safety in the potentially dangerous circumstances of a high-speed pursuit, and that he abided by that responsibility. McCann Dep. 11–16.

Plaintiff has no evidence to contradict the officers' representations as to their subjective intent. Moreover, the objective evidence of their conduct is insufficiently egregious for a fact finder to infer malice; rather, these circumstances are within a range which precedent suggests falls well short of the constitutional threshold. The officers concede they may have been driving as fast as 80 miles per hour at times during the three-minute chase. Pl.'s Resp. 6; *cf. Lewis,* 523 U.S. at 837 (police cars pursued at up to 100 miles per hour). Here, the pursuing officers fell behind the suspects to the point that they almost lost visual contact, Hazelton Dep. 47; McCann Dep. 33; even much more aggressive "hounding" by pursuing vehicles, by contrast, has been found insufficient to indicate intent to harm. *Cf. Helseth,* 258 F.3d at 872 (denying a constitutional claim even where suspect testified he "felt terrorized by [the officer]'s aggressive pursuit"). Finally, the evidence indicates that the officers used their lights and sirens during the pursuit. Although Plaintiff contends otherwise, she can point only to one witness's testimony that she did not hear sirens over the sound of her radio. *See* Popovich Dep. 22. Where the objective audio evidence—not to mention other officer and eyewitness testimony—so strongly contradicts Plaintiff's position, no genuine factual dispute exists. *See* Defs.' Ex. B, Track 6 at 1:00–3:00; Hazelton Dep. 14, 15, 18; McCann Dep. 29, 55, 56; Jones Dep. 30; Enders

Dep. 18, 23, 28.[7] Even if the officers did deviate from accepted pursuit practices at some points, the Constitution is not concerned with questions of professional misjudgment. *See Steen v. Myers,* 486 F.3d 1017, 1022 (7th Cir. 2007) ("failure to comply with departmental policy does not implicate the Constitutional protections of the Fourteenth Amendment").

A comparison with another Seventh Circuit decision—one with significantly more evidence of police misconduct—illustrates just how far away Plaintiff is from establishing a viable constitutional claim here. In *Steen v. Myers,* 486 F.3d 1017 (7th Cir. 2007), a police officer had a pre-existing relationship with the plaintiff; a previous altercation between the two furnished the basis for an inference of some personal animosity. 486 F.3d at 1019–1020. After engaging in a "cat-and-mouse" game with the plaintiff, he began pursuing him on discovering his vehicle was unregistered. *Id.* After a high-speed chase during which the officer's car followed as closely as one car-length behind the plaintiff, the plaintiff skidded off the road and died in the resulting collision. *Id.* Even if the officer's motive for beginning the pursuit might have been "suspect," the *Steen* court found that the pursuit was a "legitimate government interest," and it held the facts fell short of shocking the conscience. *Id.* at 1023–1024 (citing *Graves v. Thomas*, 450 F.3d 1215, 1223–1224 (10th Cir. 2006).

Nowhere has Plaintiff suggested that the police officers intended any harm to the robbery/burglary suspects they pursued other than their lawful arrest. Still less, of course, has she suggested that the officers harbored any hostile intent towards her as a bystander. *Cf. Schaefer v. Goch*, 153 F.3d 793, 798 (7th Cir. 1998) (finding no constitutional violation from an accidental police shooting of plaintiff bystander because "nobody has suggested that the officers intended to harm [her]"). Pursuing fleeing suspects through the streets, like the use of weapons, is an

---

[7] The issue of the officers' use of their lights and sirens is discussed further in connection with Plaintiff's negligence claims. *See infra,* § II(B).

inherently dangerous activity that is nonetheless part and parcel of the duties of a police officer. *Lewis* and its progeny in the Seventh Circuit foreclose the possibility that the accidental injury of a bystander, in the absence of any evidence of bad faith, constitutes a violation of the due process clause. Plaintiff's claims for municipal liability under the Fourteenth Amendment, whether alleging an unconstitutional custom, policy or practice, *see Grieveson,* 538 F.3d at 771, or the city's failure to train, *see Roach*, 111 F.3d at 549, thus fail.

## B. The Fourth Amendment

Plaintiff also makes a cursory allegation that Defendants violated her rights under the Fourth Amendment through their "unreasonable . . . and excessive use of force" in the police chase. Pl.'s Resp. 21. This claim fails as a matter of law. The Fourth Amendment, by its terms, applies only to "searches" and "seizures." It is apparent that Plaintiff was not "searched" by the Defendants, and the Supreme Court has explicitly held that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." *Lewis*, 523 U.S. at 844. If a Fourth Amendment claim by a fleeing suspect injured in a collision is far-fetched, a similar claim by a bystander is doubly so.

Accordingly, Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's constitutional claims pursuant to 42 U.S.C. § 1983.

## II.     State Law Claims

In addition to her constitutional claims, Plaintiff raises state law claims for damages under two negligence theories. She alleges that the City "negligently hired, supervised, and/or retained" Officers Hazelton, McCann, and Jones, despite their putative propensity to reckless behavior. Am. Compl. ¶ 21. She also asserts that the City is liable by *respondeat superior* for the negligent conduct of the officers in connection with the action itself. Am. Compl. ¶ 24.

"In order to prevail on a claim of negligence, a plaintiff is required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." *Peters v. Forster*, 804 N.E.2d 736, 738 (Ind. 2004) (citing *Benton v. City of Oakland City*, 721 N.E.2d 224, 232 (Ind. 1999)). The existence of negligence is a question of fact, and summary judgment is rarely appropriate in negligence cases; however, "a defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim." *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004). Here, we find that Plaintiff's negligent hiring, supervision, and retention theory of recovery is barred by discretionary function immunity, but that some elements of her *respondeat superior* theory have raised sufficient unresolved questions of fact to survive summary judgment.

**A. Discretionary Function Immunity**

The Indiana Tort Claims Act (ITCA) governs claims for money damages against state and local officials; as a partial reinstatement of the common law doctrine of sovereign immunity, the ITCA exempts certain types of government conduct from suit. *See City of Bloomington Utils. Dep't v. Walter*, 904 N.E.2d 346, 349 (Ind. Ct. App. 2009). In particular, the statute provides officials qualified immunity for "[t]he performance of a discretionary function." Ind. Code § 34-13-3-3(7). This immunity is limited to those "significant policy and political decisions which cannot be assessed by customary tort standards." *Peavler v. Bd. of Comm'rs of Monroe Cnty.*, 528 N.E.2d 40, 45 (Ind. 1988). As with common law qualified immunity under Section 1983, an official's conduct does not merit exemption from suit if it "violate[s] clearly established statutory or constitutional rights of which a reasonable person should have known." *Cantrell v. Morris*,

849 N.E.2d 488, 496 (Ind. 2006) (adopting Section 1983 language for the state law test); *see also*

*Kellogg v. City of Gary*, 562 N.E.2d 685, 703 (Ind. 1990).

Defendants argue that the city's hiring, supervision, and retention of the Defendant

officers falls within the scope of discretionary function immunity, and we agree. In *Foster v.*

*Pearcy,* 387 N.E.2d 446 (1979), the Indiana Supreme Court held that "the employment and

supervision of deputies and employees in governmental offices . . . is a discretionary function."

387 N.E.2d at 450. In *Coleman v. Curry*, 2013 WL 5232196 (S.D. Ind. Sept. 16, 2013), this

Court made clear that suit is barred against the Indianapolis Metropolitan Police Department for

any "decisions as to how to train and supervise employees and/or officers." 2013 WL 5232196,

at *9. So long as none of the police department's personnel decisions relating to the Defendant

officers violated clearly established constitutional or federal rights, then the City is exempt from

suit. Plaintiff urges that "failure to supervise these officers in implementing the Indianapolis

Metropolitan Police Department's own policies and procedures" amounts to such a constitutional

infraction. Pl.'s Resp. 37. As we have already discussed, failure to adhere to internal protocols

does not implicate due process concerns, and the Constitution does not enforce a nationwide

regime of professional best practices. *See Paul,* 424 U.S. at 701. Moreover, the evidence

indicates that the officers were well aware of the City's high-speed pursuit policy, and nothing in

the record indicates that the City was even guilty of negligence—let alone constitutionally

culpable misconduct—in hiring or retaining these offices. *See* Hazelton Dep. 12; McCann Dep.

7. Summary judgment is accordingly GRANTED with respect to Plaintiff's claims of negligent

hiring, supervision, or retention under state law.[8]

---

[8] Defendants also argue that the negligent supervision, retention, and hiring claims are
procedurally barred, because Plaintiff failed to give adequate notice of them in her disclosure
required by the Indiana Tort Claims Act. Although we need not decide that issue because we find

**B. The *Respondeat Superior* Claim**

Plaintiff's second negligence theory seeks to impose liability on the city for the negligent conduct of Officers McCann, Jones, and Hazelton on the morning of the accident, asserting that their failures of due care directly caused her injuries. As a general matter, such suits are permissible, and the ITCA's "enforcement" immunity does not extend to "claims of government negligence in operating emergency vehicles." *See Patrick v. Miresso*, 848 N.E.2d 1083, 1086 (Ind. 2006). Here, there can be no doubt that Plaintiff was victimized by the unjustified conduct of others, but she faces an uphill climb in establishing that she suffered harm caused by the *officers'* negligence, rather than the egregious recklessness of the fleeing suspects who actually struck her car.

As a preliminary matter, Indiana law establishes that the officers can be held liable only for their unreasonable conduct, and not the negligence or recklessness of the suspects they were pursuing. In *Bailey v. L.W. Edison Charitable Foundation of Grand Rapids, Inc.*, 284 N.E.2d 141 (Ind. Ct. App. 1972), the Indiana Court of Appeals considered the liability of officers for an accident caused by a fleeing vehicle, and concluded that "police, if engaging in a reasonable pursuit, cannot be said to be the proximate cause of accidents caused by escaping law violators." 284 N.E.2d at 145. Here, Plaintiff's designated evidence confirms that the suspects were responsible for their own reckless, high-speed driving. Officer Hazelton testified that as soon as he turned on his lights behind the suspects, "it was like someone put a rocket on the back of that

---

that immunity applies, we note that the notice requirements are to have "liberal application" in order to "avoid denying plaintiffs an opportunity to bring a claim where the purpose of the statute has been satisfied." *Smithson v. Howard Reg'l Health Sys.*, 908 N.E.2d 265, 268 (Ind. Ct. App. 2009). In this case, we have already granted a partial dismissal of Plaintiff's claims for lost wages, reduction in earning capacity, and loss of employment, finding that her Notice of Claim failed to give adequate warning that she sought such damages. Here, however, Defendants object only to the elaboration of additional *theories* of recovery for the same damages amount. We do not see any reason to bar these theories on notice grounds alone.

van. It was just gone so I had to pursue." Hazelton Dep. 35. There is no evidence that either of the officers' cars approached close enough to exacerbate the suspects' recklessness; rather, they lost position relative to the fleeing van as the pursuit progressed. *See* Hazelton Dep. 27. Given the limitations thus imposed by the requirement of proximate causation, Plaintiff must point to independent harm-causing acts of the officers in order to survive summary judgment. She advances two principal allegations aimed at satisfying that burden: that the officers failed to use their lights and sirens, and that they were negligent in initiating or continuing the chase under the circumstances.

### 1. Lights and sirens

When operating emergency vehicles, police officers owe the public a "duty to drive with due regard for the safety of all persons." *See* Ind. Code § 9-21-1-8(d)(1). Metropolitan Police Order 4.12 provides that "emergency lights and siren shall be operated while driving under pursuit conditions." Pl.'s Ex. E, at 2. As Officer McCann indicated in his testimony, the use of lights and sirens in a pursuit is essential not only as a signal to the fleeing vehicle, but for "letting the public be aware of the police presence." McCann Dep. 15–16. Given the risk to innocent motorists posed by lack of warning of approaching high-speed chases, we may assume with Plaintiff that the officers' failure to operate their sirens and lights would violate this "duty to drive with due regard" for public safety.

However, Plaintiff has raised no genuine issue as to whether the officers complied with their duty. Defendants have presented a certified audio recording from the Marion County Sheriff Department 911 call center that captures the communications between the officers and dispatchers; the cars' sirens are clearly audible on the tape. Defs.' Ex. B., Track 6, 1:00-3:00. The recorded onset of the siren is consistent with Officer Hazelton's testimony that he turned on

22

his lights and siren at the beginning of the pursuit on 56th Street. *Id.* All three officers aver that

the two cars participating in the chase had activated their lights and sirens. *See* Hazelton Dep. 14,

15, 18; McCann Dep. 29, 55, 56; Jones Dep. 30. In response, Plaintiff relies on the deposition

testimony of witness Cheryl Popovich, who did not recall hearing a siren or seeing lights but

conceded that both lights and sirens could have been on despite her failure to remember them.

Popovich Dep. 21–22. Another eyewitness, Murvin Enders, recalled hearing sirens at the time of

the accident but could not remember whether he had heard them in the seconds preceding the

collision. Enders Dep. 23. Plaintiff has made no effort to contest the veracity of the audio

recording submitted by Defendants, nor has she presented any contradicting evidence of her

own, other than the equivocal recollections of a bystander. We conclude that there is no

reasonable basis for a fact finder to infer that the officers failed in their duty use their lights and

sirens to warn the public of their pursuit of a suspect.

### 2. Initiating and continuing the chase

Although police officers may not be liable for the dangerous driving of a fleeing suspect,

they may nonetheless be held responsible for taking actions that foreseeably resulted in such a

third party's negligence. "The key to determining whether an intervening agency has broken the

original chain of causation is to decide whether, under the circumstances, it was reasonably

foreseeable that the agency would intervene in such a way as to cause the resulting injury." *Lane*

*v. St. Joseph's Reg'l Med. Ctr.*, 817 N.E.2d 266, 273 (Ind. Ct. App. 2004); *see also* Restatement

(Third) of Torts: Liability for Physical Harm § 19 cmt. c. (2005). The officers may therefore be

negligent if, in initiating or continuing the chase, they failed to weigh properly the foreseeable

risks to the public safety triggered by their decision. *See City of Indianapolis v. Earl*, 960 N.E.2d

868, 871 (Ind. Ct. App. 2012).

23

The Metropolitan Police Department's own guidelines for officers initiating and maintaining pursuit of suspects do not conclusively establish the proper parameters of the officers' duty of care, but they may help serve as a guide to some of the factors a reasonable officer should consider. *See generally Lachenman v. Stice,* 838 N.E.2d 451, 463 (Ind. Ct. App. 2005).[9] General Order 4.12 cautions police that "the decision to engage in a pursuit must be considered a very serious matter. Officers must consider not only themselves, but the general public and occupants of the fleeing vehicle, as well." Pl.'s Ex. E, at 1. The regulations provide that officers should pursue only vehicles containing identified felony suspects or who have committed traffic violations in the presence of the officers. *Id.* at 2. Section II(D) of the general order requires pursuing officers and their supervisors to consider the following factors, both before and during any pursuit:

> (1) Seriousness of the offense; (2) knowledge of the identity of the pursued suspect(s); (3) other occupants of vehicle (i.e. children); (4) weather and lighting conditions; (5) road conditions (intersections, traffic controls, overhead lighting, curves, hills, repair, width of road, etc.); (6) density of vehicular and pedestrian traffic; (7) locality of pursuit (residential, highway, etc.); (8) familiarity with area; (9) nature of pursuit (i.e. manner of operation of suspect vehicle, speeding, erratic or restless driving, etc.); [and] (10) vehicle's speed.

*Id.* at 2. Here, there is little doubt that Officer Hazelton had good reason to believe the van he spotted was driven by suspects in the recently-reported robbery and home invasion. The occupants of the van matched the number and physical description of the suspects as reported by the homeowners, and their silver Ford Windstar—encountered driving away from the

---

[9] Plaintiff argues, relying primarily on Dr. Gaut's affidavit and report, that the IMPD's pursuit policies themselves are unconstitutional, or at least negligent with respect to the risk of public harm. Because we find that there is a genuine factual question as to whether Defendant officers violated the municipal policies, we need not reach the issue of whether an officer in full compliance with them could nonetheless be negligent.

neighborhood of the crime shortly after the report came in—matched the victims' descriptions as well. *See* Defs' Br. 3 (citing Hazelton Dep. 29; Defs.' Ex. B).

However, there are occasions when it is imprudent to pursue even suspected felons, and the facts here support an inference that this could have been one of those occasions. Although they could not have known this before the chase began, the officers testified that the van began fleeing at high speeds as soon as the officers signaled their presence. Jones. Dep. 21. As Officer McCann and witnesses recalled, the suspects' van was driving recklessly and passing other cars in the oncoming traffic lane, see McCann Dep. 36; Ender Dep. 18–19 (recalling that the van was "wobbling" and driving eastbound in the westbound lane); since the chase lasted three minutes and proceeded through several intersections, the officers may have had time to react to the suspects' recklessness and suspend the pursuit. Additionally, officers are to consider their familiarity with the area, the road conditions, and the nature of the surroundings. Although the chase began on a flat stretch of road on 56th Street, it proceeded past Michigan Road onto a residential portion of Kessler Boulevard. Hazelton Dep. 25; Popovich Dep. 27. Kessler Boulevard in this area is a curvy, narrow two-lane road with very little shoulder space, and it appears that the large curve in the road where Kessler intersects with Fox Hill Road may have precipitated the suspects' van's collision with Plaintiff. Hazelton Dep. 18; Jones Dep. 32–34. Although Officer Hazelton, driving the lead chase car, had familiarity with the area in which the chase began, the Kessler area in which it ended was unfamiliar to him and outside his customary territory. Hazelton Dep. 19.

Other factors—like the seriousness of the suspected offense, the officers' degree of certainty that their suspects had committed the crime, and the generally benign weather conditions—likely weighed in favor of initiating and continuing a pursuit. However, Plaintiff has

succeeded in raising genuine questions as to the wisdom of the officers' decision to pursue the

suspects at high speeds into the terrain of Kessler Boulevard. Negligence is a predominantly

factual question, and we cannot at this stage conclude as a matter of law that the officers lived up

to their duty of scrupulous care in taking such a dangerous—if often necessary—course of

action. In *City of Indianapolis v. Earl,* 960 N.E.2d 868 (Ind. Ct. App. 2012), the Indiana Court of

Appeals considered facts similar to those before us: a high-speed chase through a predominantly

residential area, ending in the suspect's collision with an innocent motorist. 960 N.E.2d at 869.

The court concluded that a police officer may violate his statutory duty of care towards the

public when driving an emergency vehicle if he or she "continues pursuit under circumstances

where a reasonable officer, who observes the dangerous activities of the fleeing driver, would

have called off the chase." *Id*. at 871. Just as the *Earl* court affirmed denial of summary

judgment under those circumstances, so we cannot grant summary judgment here.

## III. State Constitutional Claims

Plaintiff alleges that the City and its agents deprived her of her rights under Article I,

Sections 1 and 23 of the Indiana Constitution "to enjoy and not be deprived of life, liberty, or

property, and to enjoy equal protection of the law." Am. Compl. ¶ 11. Article I, Section I of the

Indiana Constitution does indeed recognize these "inherent rights" of life, liberty, and property,

and Article I, Section 23 contains a guarantee of "equal privileges and immunities" to all citizens

of the state. Ind. Const. Art. I, §§ 1, 23. However, as Defendants have pointed out, neither these

nor any provisions of the state constitution provide a cause of action for the vindication of these

constitutional rights. "No Indiana court has explicitly recognized a private right of action for

monetary damages under the Indiana Constitution," *Smith v. Ind. Dep't of Corr.*, 871 N.E.2d

975, 985 (Ind. Ct. App. 2007), and Indiana has neither a statutory nor common-law analogue to

the right of action provided to redress federal constitutional grievances by Section 1983. *See Cantrell v. Morris,* 849 N.E.2d 488, 493 (Ind. 2006). Plaintiff has provided us with no vehicle through which her putative claim could be heard, and it is not the federal courts' role to discover new implied state causes of action. *See Estate of O'Bryan v. Town of Sellersburg,* 2004 WL 1234215 , at *21 (S.D. Ind. May 20, 2004). Accordingly, Defendants' Motion for Summary Judgment is GRANTED with regard to claims arising under the Indiana Constitution.

## IV. Continuing Exercise of Jurisdiction

Having determined that none of Plaintiff's claims arising under federal law survives summary judgment, we turn to the question of whether we should retain supplemental jurisdiction over the remaining state law negligence claim. We exercise supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a), which extends federal jurisdiction to all claims that are so related to a claim within the court's original jurisdiction that they form part of the same case or controversy within the meaning of Article III of the Constitution.

Federal courts can decline to exercise supplemental jurisdiction in certain circumstances, including when a court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Seventh Circuit has identified the following three situations in which a court should retain jurisdiction over supplemental claims even though all federal claims have been dismissed: where the statute of limitations would bar the refiling of the supplemental claims in state court; where substantial federal judicial resources have already been expended on the resolution of the supplemental claims; and where it is obvious how the claims should be decided. *Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 906–07 (7th Cir. 2007) (citation omitted).

Neither party set forth arguments in their briefing regarding this issue.  However, given the degree to which Plaintiff's state law and federal claims are interrelated and the significant federal resources that have already been expended on this case, we believe that it would be in line with the principles of judicial economy, fairness, convenience, and comity to exercise supplemental jurisdiction over Plaintiff's state law claims here.  *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (observing that, "when deciding whether to exercise supplemental jurisdiction, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity") (internal quotation marks and citation omitted); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353 (1988).

## Conclusion

The severe injuries that Plaintiff Andrea Smith suffered when fleeing burglary/robbery suspects collided with her car at high speeds were certainly undeserved; a reasonable fact finder could also find that the exercise of greater care by Defendant police officers might have made them preventable. No juror, however, would be warranted in concluding that the City or any of the defendant police officers intended harm to come to Plaintiff. This case raises the possibility of bad judgment, but not the arbitrary and egregious misuse of government power. Accordingly, we dispose of Defendants' Motion for Summary Judgment as follows:

(1) Summary Judgment is GRANTED as to all constitutional claims brought under 42 U.S.C. § 1983.

(2) Summary Judgment is GRANTED as to the state law claims of negligent hiring, retention, and supervision barred by discretionary function immunity.

(3) Summary Judgment is DENIED as to the claims of municipal supervisory liability for the officers' negligent conduct.

(4) Summary Judgment is GRANTED as to the claims under Article I of the Indiana Constitution.

IT IS SO ORDERED.

Date: ___09/30/2013

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Alexander Phillip Will
OFFICE OF CORPORATION COUNSEL
awill@indygov.org

Beth Ann Garrison
OFFICE OF CORPORATION COUNSEL
beth.garrison@indy.gov

Timothy Arthur Rowe
ROWE & HAMILTON
trowelaw@aol.com

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
ard@rucklaw.com

Edward J. Merchant
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
ejm@rucklaw.com

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
jfk@rucklaw.com